JOHN ALEXANDER DOWIE

*v.*

CHICAGO, WAUKEGAN AND NORTH SHORE RAILWAY CO.

*Opinion filed February 21, 1905.*

1. EMINENT DOMAIN—*when municipal corporation need not be made party to proceeding.*  It is not essential to the jurisdiction of the court of a proceeding to condemn a right of way over lands of private owners within the limits of a town or city, that the municipal corporation be made a party to the proceeding as the owner of the public streets and alleys crossed by the right of way.

2. SAME—*license from city to cross streets and alleys not essential to right to condemn.*  The right of a railroad company to condemn, for right of way, lands of private owners located within the limits of an incorporated town or city, is not affected by the absence of a license from the municipal corporation authorizing the petitioner to cross streets and alleys.

3. SAME—*subsequent incorporation of territory does not affect prior location of right of way.*  Incorporation of territory into a town or city after a railroad company has located, staked out and platted its right of way through such territory does not deprive the company of the priority of location.

4. SAME—*when condemnation petition will be regarded as filed.*  A petitioner in condemnation which delivers its petition and plat to the clerk of the proper court for filing is entitled to the benefit and advantage of such act, the same as though the petition had been formally filed by the clerk, even though the fee for filing was not advanced or tendered, the clerk not then making demand therefor.

5. SAME—*rights of parties date from time petition is filed.*  The rights and interest of the parties to a condemnation proceeding date from the time the petition for condemnation is filed.

6. SAME—*when filing of plat of proposed town does not affect petitioner's rights.*  The filing of a plat showing part of the territory to be embraced in a proposed town or city, before the filing

214—4

of a petition to condemn a right of way through such territory, does not affect the rights of the petitioner, where the condemnation petition was filed before the organization of the town or city was effected by a canvass of the votes.

7. SAME—*rules for determining value of land are binding upon all owners alike.* The rules for determining the compensation to be paid for land taken or damaged for a proposed railroad right of way cannot be varied or made to depend upon the peculiar religious views entertained by the owner, which he believes give the land a greatly enhanced value.

APPEAL from the Circuit Court of Lake county; the Hon. C. H. DONNELLY, Judge, presiding.

V. V. BARNES, CHARLES E. LAUDER, and P. R. BARNES, for appellant.

ELA, GROVER & GRAVES, for appellee.

Mr. CHIEF JUSTICE RICKS delivered the opinion of the court:

This appeal was prosecuted from the judgment of the circuit court of Lake county fixing and awarding appellant damages in a condemnation proceeding brought by appellee for its right of way.

Appellee is a railroad corporation organized under the laws of this State, and authorized to construct and operate a railroad from the State line between Illinois and Wisconsin, in Lake county, Illinois, and in the township of Benton, (in which township the land in controversy lies,) to and into the city of Chicago. Several years before this petition was filed and before appellant acquired the lands in controversy the Chicago North Shore Belt Terminal Railroad Company was organized, and located its line of road immediately adjoining the Milwaukee division of the Chicago and Northwestern railroad, acquired a part of the right of way and partially constructed a portion of its railroad by grading and laying railroad ties. Appellee succeeded to its rights. About

the year 1900 John Alexander Dowie, the appellant, pur-
chased about 6600 acres of land in said Benton township, in
Lake county, and at the time of this proceeding still owned
the same. Among the lands so purchased was the whole or ·
the greater part of sections 15, 22· and 27 in said Benton
township, and described in the petition as town 46, range 12,
east of the third principal meridian, in Lake county. The
strip through these three sections that was condemned is
one hundred feet wide and contains 21.22 acres. Between
the 20th and 26th days of March, 1902, the appellee located
and staked out the line in question, and in the latter part of
March or first of April (about which date there is some con-
troversy) filed its petition and plat of its right of way in said
court and began this proceeding. To the proceeding the
Zion Lace Industries, a corporation organized under the
laws of this State and operating a lace factory on part of the
lands formerly purchased by appellant, was made a party, as
also were other parties. Appellant filed his cross-petition, in
which he claimed that the lands sought to be taken were of
the value of $221,000, and that lands not taken and adja-
cent thereto would be damaged in the sum of $100,000. A
jury was waived and the cause tried before the court with-
out a jury, and the trial judge, at the solicitation of both the
parties, personally visited and viewed the lands in contro-
versy and all the surroundings in that locality,—the land to
be taken and the remainder adjacent thereto. The hearing
covered a long period of time and the record contains about
one thousand pages. The court awarded damages for be-
tween 17 and 18 acres of land taken, at $300 per acre, and
for lands not taken but damaged, about 20 acres, at $100
per acre.

While many errors are assigned but few are mentioned
in the argument, and our consideration will be confined to
those to which our attention is directed.

It is first contended that Zion City, a municipal corpora-
tion, should have been made a party, and that without hav-

ing all the parties in interest before it the court did not have jurisdiction to proceed and find appellant's damages. No authority is cited upon this question except section 2 of the Condemnation act. This section has been a number of times construed, and the holding of this court has been uniformly adverse to the contention of appellant. (*Bowman v. Venice and Carondelet Railway Co.* 102 Ill. 459; *Indiana, Illinois and Iowa Railroad Co. v. Conness,* 184 id. 178.) In the latter case it was said (p. 180) : "It is not essential to the jurisdiction of the court that all the owners shall be brought into court, even as to land taken, but compensation may be ascertained separately." There is no reason for the rule contended for by appellant. One who has an interest in the property and who is not made a party is not affected by the proceeding and loses no rights thereby, and it is of no concern to appellant that other persons who may have interests are not made parties, as appellant is in no manner affected or controlled by the rights of other persons as to his damages and as to his rights under the petition. The proceeding would be as though no other party was defendant. In the case at bar, if appellant's contention that the city of Zion was a municipal corporation and was the owner of the streets and alleys over a portion of the lands through which the appellee condemned its right of way was sound, he is not only not injured but greatly benefited by the fact that the city was not made a party, as he has·been allowed compensation for the value of all the lands taken by appellee that he claims belong to the streets and alleys of said city, and the only effect will be that if he receive pay therefor and the land does not belong to him, the city will still be at liberty to assert its claim.

The contention that appellee could not condemn its right of way over the lands of appellant lying within the present corporate limits of Zion City because it (appellee) did not have a license to cross or traverse the streets and alleys of Zion City cannot be admitted. If such license ·is necessary the question only affects the rights of appellee and the city,

and appellee may, if it becomes necessary, obtain the license of the city at any time before it constructs its road. (*Suburban Railroad Co.* v. *Metropolitan West Side Elevated Railroad Co.* 193 Ill. 217.) Besides, the evidence shows, beyond question, that appellee had located, surveyed and staked out its route for its road over the land in question before the incorporation of Zion City, and the subsequent incorporation could not affect appellee's right to the extent of depriving it of its priority of location. When Zion City became incorporated it was bound to and did take notice of appellee's rights and prior location by showing upon its plat the exact location and width of appellee's right of way. This latter fact is denied by counsel for appellant, but the recorded plat incorporated in the record shows that such was the case. On March 28 or 29 (which of said dates being uncertain) appellee, by special messenger, delivered into the hands of the circuit clerk of Lake county the petition for condemnation and the plat or profile of its right of way as located, with a written request, in the form of a letter to said clerk, to file both the petition and the plat and issue summons against the appellant and deliver the same to the sheriff, and stating that the attorney would remit. The clerk received said papers from the messenger and retained the same till March 31, 1902, when he wrote the appellee's attorney that he doubted his right to file the survey or plat, and stated the docket fee was $16, but did not state whether he had filed the petition or not. The attorney for appellee visited the clerk April 1 and requested the clerk to file the papers as of the date delivered, but the clerk would not do so but filed them as of April 1. The clerk, at the time the papers were presented to him, did not demand the fee, but held the papers until Zion City had voted to be incorporated and appellant had filed a plat subdividing a portion of the territory through which appellee's right of way was located. The messenger testified that the clerk received from him the package and read the letter and stated it was all right. The clerk testified that the

messenger left before he had time to read the letter. The testimony tends to show, or strongly raises the suspicion, that the clerk was fully aware of the nature of the papers and the importance attached to their filing, and of the proceedings that were being taken by appellant to prevent the appellee from having the benefit of the proceedings, by the incorporation of part of the territory through which the line was to run. We are not prepared to hold that the failure of appellee to advance or tender the fee, when not demanded, deprived it of the benefit of the prior presentation of the petition and plat to the clerk. It has been well said that one having an instrument to file in an office can only present it to the proper officer, and when he has done that he has all the benefit and advantage of the act as though it had been formally filed, as he has no control over the person of the officer; and we feel entirely warranted, on a well established line of authorities and under the facts established by the record, in holding that appellee was entitled to the benefit of the filing as of March 28 or 29, either of which dates was anterior to the incorporation of Zion City. *Cook* v. *Hall,* 1 Gilm. 575; *Merrick* v. *Wallace,* 19 Ill. 486; *Nattinger* v. *Ware,* 41 id. 245; *Hamilton* v. *Beardslee,* 51 id. 478; *Pease* v. *Fish Furniture Co.* 176 id. 220; 8 Ency. of Pl. & Pr. 923.

The question of the filing of the petition in this case becomes important in another aspect of the case. Appellant contends that Zion City was incorporated before the filing of the petition, and that the property sought to be condemned should have been recognized as blocks, streets and alleys, as shown by the plat, and that appellant was entitled to have the court take into consideration the fact that at the time the petition was filed a large portion of the property belonging to appellant that was proposed to be taken in the right of way was within the limits of an incorporated and platted city. The rule seems to be clear that the rights and interests of the parties date from the time of the filing of the condemnation petition. (*Dupuis* v. *Chicago and North Wiscon-*

*sin Railway Co.* 115 Ill. 97; *Chicago and Iowa Railroad Co. v. Hopkins,* 90 id. 316.) Appellant, on March 29, 1902, filed the plat of a portion of the territory that was afterwards included within the corporate limits of Zion City, and it is argued that as that plat was filed prior to appellee's plat or petition, appellant has gained the priority thereby; and it is also contended that by the filing of the plat, and that being followed by the incorporation on the 31st of March and later by the election of officers, by the principle of relation the whole incorporation will date as of the time of the filing of the plat. These contentions are not supported by reason or authority. The statute expressly fixes the time when the incorporation is effected, and that is the time when the vote is canvassed and determined to be for the incorporation or organization under the general law, and that occurred on the 31st day of March. But at that time, however, there were no officers, and could be none until an election was called, which took place on the 23d of April, when the mayor and aldermen were elected, as well as other municipal officers. But the plat was not part of the organization of the city. The plat is not required by the statute in order that a territory may become incorporated as a city, and in this case much of the territory that was incorporated was not platted,—in fact but a small portion of it was platted. It is apparent from this record that the main purpose of incorporating and platting was to defeat, if possible, appellee's petition. But we do not regard either as having any effect upon this proceeding.

The main controversy in this case is as to the amount of damages allowed appellant for the lands. The record discloses that in 1900 and 1901 appellant purchased 6600 acres of land at prices ranging from $100 to $500 per acre. The land is in one entire body and extends westward from Lake Michigan, and includes the lake frontage and wharfage and other valuable rights; that the land near the lake, and having shipping advantages, was the most valuable land, and some of which, at least, was purchased for $500 an acre. It

also appears that the Chicago and Northwestern Railroad Company has had for some years a line of road through the portion of the city that has been platted and subdivided, and that Dr. Dowie, who is substantially the city and everything that pertains to control and domination in that territory, has arrangements that are satisfactory to him with the railroad company that is already there, and had determined that this company should not, if he could prevent it, traverse his territory. As to the extent of damages the testimony is irreconcilable. Dr. Dowie fixes his damages at $250,000 for the right of way, and says that he would consider that a very moderate sum. He estimates the value of the land at from $4000 to $5000 an acre; and the damages in excess of this amount, over the land taken, he thinks would arise from interference with their driving to the lake from the town west of the railroad, and interference with parks that he has planned to have and some of which he shows upon the plat, and that the property taken is what he regards as part of his most valuable residence property. He states that he does not sell lots or real estate, except that he sells leases for eleven hundred years; that he estimates the value of the land he holds at thirty millions of dollars, and that he expects in a short time to have a city of a population of fifty thousand. Other witnesses, members of the church of which he is the head and identified with him in the organization of the church and territory into a religious settlement and city, most of them bearing an official relation to the church, testified, and their testimony is largely in the language used by Dr. Dowie, and they agree with him, substantially, in amounts. To put their claim concretely, they say that there are one hundred thousand members of that church, and that they are all desirous of residing at Zion or Zion City, and that they are coming to it as rapidly as they can dispose of their holdings and interests elsewhere; that the properties that have been sold by leasehold have been paid for chiefly with scrip issued by Dr. Dowie for loans and advances made

to him or to his church, which are evidenced by what are termed certificates but are substantially promissory notes, in which Dr. Dowie agrees to pay the amount of money named and eight per cent interest thereon; that anyone holding sufficient of this scrip and being identified with the church can exchange the scrip for leasehold interests in lands, and that leases have sold for from $300 to $2000 or $3000 each, depending upon location; that a year or two ago the Zion Lace Industries corporation was organized, and that property was leased or sold for $800 an acre upon which to construct its factory. The evidence shows that Dr. Dowie was the president and principal stockholder of the lace factory. It also discloses that his followers accept him as a prophet of the Lord, and believe that Zion City was established in answer to prayer and its progress has been made entirely through the intervention of Divine Providence.

For the petitioner, appellee, many witnesses thoroughly conversant with real estate in and along the route of this right of way, including the lands owned by Dr. Dowie and those adjacent to them on three sides, testified that on the lake shore, and extending back some little distance from the lake, the lands are higher and more valuable than are the lands along the line of this right of way; that between the high lands near the lake and the lands west of the right of way of the Chicago and Northwestern Railroad Company are what they term low lands, subject to overflow, and gathering considerable bodies of water during freshets and the rainy season; that the elevation of the lands along in the vicinity of this right of way, which is almost parallel to that of the right of way of the Chicago and Northwestern Railroad Company lying east of it, is only about six feet above the lake; that west of the right of way of both of these roads are high, rolling and desirable lands for residence and other purposes, and that the lands along the right of way are only suitable for manufacturing purposes, and for small or cheap tenements, and that these lands are not worth to exceed $300

per acre, and that the lands adjoining them on both the north and south can be obtained for from $100 to $200 per acre.

The witnesses for appellant admit that the lands owned by appellant have no market value in the sense that there is any demand for them outside of the membership of Dr. Dowie's church, and while it is difficult to get from the language of Dr. Dowie and his followers the exact elements that they take into consideration in fixing the value of the lands, one cannot read the testimony and come to any other conclusion than that the value as fixed by them is what is termed in law largely fanciful, sentimental and speculative, resting to a great extent upon the religious sentiment that obtains among his people. They point to the marvelous growth of Zion City, which had reached in less than two years nearly ten thousand population, with twelve hundred to fifteen hundred houses or buildings, and some of them say that it is not the present money value of the land that they fix, but that it is the future prospects and the great religious settlement, with its moral attributes, that will be eventually gathered there, that enter in and form a part of their estimate. Some of them testified as to the amounts that they had paid for lots, showing that they had paid from $500 to $1200 for a single lot, and when asked to explain upon what theory or principle they could receive any income or per cent upon the money that they had thus invested, they explain by saying that whatever they paid for lots went to the building up of Zion, and that they must all pay their tithes towards building it up, and that these moneys invested in lots were used by Dr. Dowie in the development of the religious settlement and the advancement of their cause, and from which they derived the benefit. In speaking also of the industries now established and in contemplation there, it was said that those employed were members of the church and participated in the profits of the business.

The testimony all agrees that along this right of way no lots have been sold or leased, either in acre tracts or other-

wise, except to the lace industry; that the ground is all open ground and wholly unimproved, outside of the lace industry, and the contention of appellant and all of his witnesses is almost wholly founded upon the theory that when they get the people there that they expect to have and the industries established that they expect to establish, there will be a market for all of this property at the prices they have named. Counsel for both sides agree that the market value of the property is the measure of appellant's damages, and the contention arises over what shall be termed, in this case, the market value. Appellant says that the values here cannot be measured upon the same basis or theory of any other place or city in the world, as there is no other that is organized upon the same plan and no other that has made such growth and has such prospects; that this settlement and property of Dr. Dowie are *sui generis.* This latter statement may be readily admitted when it is said that a city is organized, comprising a population of at least ten thousand, with but a single freeholder in it. Dr. Dowie seems to be the only person of all his church that is the owner of a freehold estate in any of that land. It may well be doubted if that number of people could be brought together anywhere, or under any conditions other than those that seem to surround them under Dr. Dowie's leadership, who would be willing to hold their properties under such a tenure. The evidence shows that upon all sides of this property, except the east side or where it is bounded by the lake, almost unlimited acres of land can be obtained now at prices ranging from $100 to $200 per acre, so that it cannot be said in this case that the land sought to be taken for railroad purposes by appellee is indispensable to the business or existence of Dr. Dowie's church or the material welfare of his followers.

The right to entertain any religious belief one or any number of people may see fit to adopt, so long as it does not lead to violation of law, is one that is guaranteed by the very spirit of our institutions; but that right does not bring to

it or carry with it increased or additional property rights to those held by other people adopting other religious views or no religious views. The rule of law as applied to the right of condemnation is alike applicable to the property of Dr. Dowie as it is to that of any other citizen, and the fact that he may have in his mind and may have formulated a great plan for the upbuilding and salvation of people cannot, of itself, impress his property with an increased value that must be recognized by the law when its use is demanded in the name of the State, but that property must be measured as other property owned by other people in the same vicinity and similarly situated.

The uniformity of view of appellant and his witnesses with reference to the values and effect of this proposed railroad can only be accounted for by the absolute faith his followers have in him and his religious teachings. They all seem to look upon their interests and prospects from identically the same standpoint. The court, acting as a jury, went upon these lands and examined them, and, as we have said, the evidence is so conflicting that no one could hope to reconcile it. We are unable to conceive that anyone not embracing the religion and accepting the views and leadership of the appellant could reach the conclusion that his theory of this case supports, and we have no doubt but that a re-trial would result in a similar conflict of views arising out of the same conditions that are not likely to change during the life and leadership of appellant. Where the court, acting as a jury, or the jury, views the premises and has heard the testimony of the witnesses, and the evidence is so conflicting that it cannot be reconciled, this court does not feel warranted in disturbing the findings. *Hercules Iron Works* v. *Elgin, Joliet and Eastern Railway Co.* 141 Ill. 491; *Chicago General Railway Co.* v. *Murray,* 174 id. 259.

The judgment and award as made by the court will be affirmed.                    *Judgment affirmed.*